UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
SEAN IMRAN,

<table>
<tr><td>Plaintiff,</td><td>Case No.: <strong>24-CV-7735</strong></td></tr>
<tr><td>-against-</td><td><strong>VERIFIED COMPLAINT</strong></td></tr>
<tr><td>LEGAL AID SOCIETY OF SUFFOLK COUNTY, INC.</td><td>Jury Trial Demanded</td></tr>
<tr><td>Defendant.</td><td></td></tr>
</table>

--------------------------------------------------------------------X

Plaintiff SEAN IMRAN (hereinafter, "PLAINTIFF" or "IMRAN"), by and through his undersigned attorneys, PERVEZ & REHMAN, P.C. files this Complaint against Defendants LEGAL AID SOCIETY OF SUFFOLK COUNTY, INC. (hereinafter "DEFENDANT" OR "LAS "), stating as follows:

## **INTRODUCTION**

1. This is a civil action for claims of unlawful and discriminatory employment practices that were perpetrated against PLAINTIFF by DEFENDANT.

2. This action is intended to provide appropriate relief to PLAINTIFF, who was adversely affected by these actions.

3. This is an action seeking declaratory, injunctive and equitable relief, as well as monetary damages, to redress DEFENDANTS' violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* (hereinafter "Title VII") and New York State Executive Law, §§ 296 *et seq.*

4. Specifically, DEFENDANTS violated Title VII by discriminating against PLAINTIFF on the basis of his race, religion and national origin.

5. DEFENDANTS then proceeded to terminate PLAINTIFF in a retaliatory fashion after he complained about said discrimination.

6. Further, this action seeks damages to redress the injuries PLAINTIFF has suffered as a result of discrimination creating a hostile work environment.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 2000e-5(f)(3), §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of PLAINTIFF's rights pursuant to Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII").

8. This Court has supplemental jurisdiction over PLAINTIFF's state law claims pursuant to 28 U.S.C. § 1367.

9. Venue is properly laid in the Eastern District of New York pursuant to 28 U.S.C. §1391 because both the PLAINTIFF and DEFENDANT are located in the Eastern District of New York, and a substantial part of the acts or omissions giving rise to the claim occurred in the Eastern District of New York.

## PROCEDURAL REQUIREMENTS

10. Prior to commencing this action, PLAINTIFF filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on February 13, 2024.

11. PLAINTIFF's EEOC charge arose out of many of the same facts alleged herein.

12. PLAINTIFF received the Notice of his Right to Sue on August 23, 2024.

13. Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

*Plaintiff*

14. PLAINTIFF is a resident of Suffolk County, New York.

15. At all relevant times, PLAINTIFF met the definition of an "employee" under Title VII, and state/local laws.

16. Plaintiff identifies as a Muslim and a Pakistani male.

*Defendant*

17. DEFENDANT is a New York-based agency with a principal place of business located at 320 Carleton Avenue, Suite 2500, Central Islip, NY 11722.

18. DEFENDANT is subject to the requirements of Title VII because DEFENDANT employs fifteen (15) or more employees.

19. DEFENDANT is subject to the requirements of New York State Division of Human Rights because DEFENDANT employs four (4) or more employees.


## FACTUAL ALLEGATIONS

*Plaintiff's Employment with Defendant*

20. PLAINTIFF was employed by DEFENDANT from October 12, 2021 until November 14, 2023 as a Staff Attorney.

21. Plaintiff's responsibilities as a Staff Attorney included representing clients in court through appearances, litigation, hearing, trials and motion practice.

22. During his tenure with DEFENDANT, PLAINTIFF consistently maintained one of the highest caseloads in his department.

23. In addition to his heavy workload, PLAINTIFF maintained a satisfactory work record throughout his employment and received a positive performance evaluation after his first year.

***Consistent and Pervasive Discrimination***

24. Due to PLAINTIFF's Muslim and Pakistani last name, other employees working for DEFENDANT gradually became aware of PLAINTIFF's ethnic and religious background.

25. April Winecke (hereinafter "Ms. Winecke") was a Senior Staff Attorney while PLAINTIFF was employed at LAS.

26. Ms. Winecke was PLAINTIFF's supervisor from November 1, 2021, through July 14, 2023.

27. On or about November 22, 2021, at about 10 a.m., Ms. Winecke mocked PLAINTIFF's accent while PLAINTIFF was in her office. Specifically, she remarked: "You do have a little bit of an accent, I don't know if anyone has told you that."

28. Ms. Winecke then proceeded to ask PLAINTIFF where PLAINTIFF was "from," indicating that he was an "outsider" because of PLAINTIFF's national origin.

29. On or about June 14, 2022, through December 15, 2022, PLAINTIFF was assigned to D61 Courtroom Assignment with The Judge. [1]

30. Throughout his time in D61, PLAINTIFF was subjected to severe and pervasive discrimination at the hands of The Judge.

31. PLAINTIFF's employers did nothing to protect him; instead, they hopped on the bandwagon and continued the harassment, both in and out of the courtroom.

---

[1] For the purposes of this public filing, the Judge referred in this action shall be referred to as "The Judge."

32. The Judge would frequently both mispronounce PLAINTIFF's last name during case proceedings and make disparaging remarks about Pakistanis and Muslims.

33. For example, while discussing the educational background of an Afghani client ("Dr. K") during a bench conference with The Judge, PLAINTIFF presented the fact that PLAINTIFF's client is a doctor who graduated from a medical school in Karachi, Pakistan.

34. The Judge responded by cutting PLAINTIFF off, stating that "she knows many languages, but Pakistani is not one of them."

35. The Judge was even informed that Dr. K passed two parts of the admission exam in the United States; however, they refused to believe or consider that Dr. K was a real "doctor." The Judge's behavior, which included smirking, huffing, and puffing, signified that Dr. K's educational background, despite satisfying both national and international requirements, was inferior solely because he was educated in Pakistan.

36. PLAINTIFF's supervisors and colleagues witnessed this treatment, yet did nothing.

37. Additionally, the Judge would purposefully mix up PLAINTIFF's name with a former female Staff Attorney (Nadia Anwar - hereinafter "Ms. Anwar").

38. Despite correcting her multiple times, she would call PLAINTIFF names like "Amram" or "Anwar." The tone of The Judge's conduct was clear; she did not simply "forget" or "mispronounce" PLAINTIFF's name innocently - it was purposeful and considered a joke.

39. It should be noted that, upon information and belief, Nadia Anwar was also discriminated against, and eventually left LAS due to the discrimination.

40. While enduring this discriminatory conduct, PLAINTIFF consistently complained to Deputy Bureau Chief Steve Fleming, Deputy Bureau Chief, Denise Ahern, Ms. Winecke, and Bureau Chief Catherine Lovly (hereinafter "Ms. Lovly"), about The Judge's inappropriate and discriminatory harassment.

41. Instead of remedying the hostile work environment, these individuals compounded the problem.

42. PLAINTIFF verbally reported discriminatory incidents (such as the frequent and intentional mispronunciation of his name in the courtroom) to Ms. Lovly, but she would simply ignore the concerns brought to her attention.

43. Ms. Lovly was also responsible for checking on the staff attorneys in courtrooms; thus, she visited courtroom D61.

44. PLAINTIFF reported the mistreatment by The Judge to Ms. Lovly, but she refused to take any remedial action to fix the situation.

45. For example, after one or two weeks of PLAINTIFF's case assignment, Ms. Lovly started to laugh when PLAINTIFF attempted to address the discrimination. "Oh, maybe The Judge thought that you were Nadia Anwar."

46. These remarks enabled further harassment from other LAS employees, and ensured that PLAINTIFF's concerns were not sincerely evaluated or acknowledged.

47. Additionally, PLAINTIFF informed Ms. Lovly that The Judge continued to make discriminatory comments toward him. Ms. Lovly responded that PLAINTIFF should know that "Judges are political hacks" and that she "does not think there is anything we can do to change The Judge."

48. PLAINTIFF expressed to Ms. Lovly that The Judge's actions violated federal and state laws; Ms. Lovly responded that The Judge is the way they are and they are not going to change no matter what you do; welcome to Suffolk County."

49. Ms. Lovly also informed PLAINTIFF that because The Judge was married to a court officer there she doubts that anyone could do anything to address how they treat PLAINTIFF or PLAINTIFF's cases.

50. Ms. Winecke was also made aware of the harassment and discrimination that PLAINTIFF faced throughout the period of his assignment to The Judge's courtroom. She informed PLAINTIFF that she would discuss the ongoing mistreatment by The Judge with Ms. Lovly.

51. For example, when PLAINTIFF reported that The Judge purposefully mispronounced PLAINTIFF's last name and confused PLAINTIFF with Ms. Anwar, Ms. Winecke would then ask PLAINTIFF if he had corrected The Judge. PLAINTIFF informed her that PLAINTIFF corrected her multiple times, but The Judge's actions remained unchanged.

52. Ms. Winecke then responded that "The Judge is racist," but nevertheless did nothing to intervene or stop the discrimination.

53. Steve Fleming (hereinafter "Mr. Fleming") and Denise Ahern (hereinafter "Ms. Ahern"), both Deputy Bureau Chiefs, conducted case reviews with PLAINTIFF. During these case reviews, PLAINTIFF once again complained about the discrimination PLAINTIFF experienced when he was before The Judge.

54. Ms. Ahern proceeded to openly laugh when she was informed about the harassment during the case review meeting.

55. In fact, when PLAINTIFF would complain to Ms. Ahern, she would mock the fact that PLAINTIFF was being discriminated against.

56. For example, when PLAINTIFF would disagree with Ms. Ahern on a topic of discussion during a case review, she would target PLAINTIFF by repeating The Judge's mockery of PLAINTIFF's last name, and continuously ask PLAINTIFF about where he was from. This happened in front of PLAINTIFF's colleagues, and was embarrassing to say the least.

57. This ridicule also undermined the complaints PLAINTIFF had made to Ms. Ahern. PLAINTIFF's supervisor mocked his legitimate complaints, and rather than addressing PLAINTIFF's discomfort, she perpetuated the discrimination.

58. Additionally, Mr. Fleming ignored PLAINTIFF's complaints of discrimination. Mr. Fleming also acknowledged and stated that he was aware The Judge harbored racial prejudices.

59. For example, when PLAINTIFF informed Steve about being called "Mr. Anwar" or "Amram," Mr. Fleming responded with, "yeah, [The Judge] is racist."

60. Again, nothing was done to address the harassment PLAINTIFF was facing.

61. Kara Brown, (hereinafter "Ms. Brown"), a Staff Attorney who also conducted case reviews during PLAINTIFF's employment with LAS, was also made aware of, and witnessed, the racist behavior exhibited by The Judge towards PLAINTIFF.

62. On or about July 28, 2022, while in Robert Levinson's (hereinafter "Mr. Levinson") office, Mr. Levinson and Matthew Klopman (hereinafter "Mr. Klopman), both staff attorneys, made comments about eating a bacon, egg and cheese sandwich to annoy and disrespect a Muslim client, TF. They were mocking the fact that Muslims do not

eat bacon. PLAINTIFF found this to be highly unprofessional and offensive behavior, especially because PLAINTIFF is also Muslim.

63. On or about July 28, 2022, at approximately 11:15 a.m., Ms. Lovly whispered in PLAINTIFF's ear and asked him to "check on Robert Levinson" to "make sure he is okay." She asked PLAINTIFF to share his opinion about the actions of the client; the same Muslim client the two staff attorneys mocked as described above.

64. Ms. Lovly then proceeded to ask PLAINTIFF questions, such as "What do you think of that Muslim client?", "Isn't that crazy?", and "I wonder why some people are so obsessed with their religion….Jesus!"

65. On or about August 28, 2022, at approximately 10 a.m., Ray Smith (hereinafter "Mr. Smith") made derogatory comments about PLAINTIFF's last name in the hallway outside of his office.

66. Mr. Smith asked PLAINTIFF "what kind of last name is that?" and "Is it Muslim? Are you Muslim? Look at this guy with a Muslim last name. Get out of here. Why don't you shave… huh? Are you a Muslim? You don't shave because you're a Muslim right?"

67. On or about September 16, 2022, Ms. Winecke called PLAINTIFF "dead mouth" in the hallway outside Mr. Levinson's office.

68. The harassment was relentless and permeated throughout the workplace in every possible way, making every day uncomfortable and hostile for PLAINTIFF.

69. For example, on or about September 20, 2022, Ms. Winecke failed to guide PLAINTIFF properly, asking him to perform a duty which could have been accomplished in a much easier manner. PLAINTIFF felt that this was intentional in order to further annoy and harass him.

70. On or about September 30, 2022, Ms. Cammarata spelled PLAINTIFF's last name wrong in an email. In isolation, this may not seem offensive; however, considering that PLAINTIFF's name has been a running, offensive "joke" in the workplace, it is yet another example of harassment. It was spelled in the same fashion as The Judge's racist remarks. Her actions were purposeful and intended to further the communal harassment.

71. On the same day, Mr. Smith interrupted a conversation PLAINTIFF was having with a client and announced that PLAINTIFF was not a "real attorney." Comments like these to clients can, and have had, a dangerous impact on client/attorney relations and trust.

72. On or about December 7, 2022, at approximately 10:30 a.m., Ms. Cammarata mocked PLAINTIFF's last name and called him "Mr. Anwar" in the hallway in front of Mr. Levinson's office.

73. On or about December 9, 2022, Mr. Smith asked PLAINTIFF about his nationality while in his office. Mr. Smith assumed that PLAINTIFF was Muslim and stated, "there are not many Muslims in Suffolk County." He stated that in Suffolk County, Irish Catholicism is the dominant religion. Mr. Smith also mentioned that he was half German and half Irish, and that Germans are the most superior race, even among other white ethnicities.

74. On or about December 12, 2022, Mr. Levinson called PLAINTIFF "Mr. Anwar" in the hallway, purposefully conflating him with former Pakistani employee Nadia Anwar.

75. On or about December 15, 2022, Ms. Winecke acknowledged The Judge's racist behavior and mispronunciations of PLAINTIFF's last name when PLAINTIFF complained in her office.

76. PLAINTIFF endured the unlawful discrimination and harassment for months at the hands of The Judge. Finally, on or about December 16, 2022, after a myriad of

complaints, PLAINTIFF was moved from Courtroom D61 to D56. However, PLAINTIFF was still asked to keep a few cases which were under The Judge's purview, even after the reassignment.

77. Because of this, PLAINTIFF was still forced to endure harassment from The Judge.

78. In fact, on December 28, 2022, The Judge, in Courtroom D11, during arraignment proceedings, stated to Charlie, the Clerk of the Court, that "the punishment of *Mr. Amram* is ending, look how happy he is, … look at the smile on his face."

79. Staff Attorney Kenny Somarriba witnessed this incident, and told PLAINTIFF that he feels The Judge's treatment of PLAINTIFF is not right.

80. On or about January 10, 2023, at approximately 1:20 p.m., Mr. Smith sent a text message to PLAINTIFF which contained an article discussing the history of the United States. This article was shared **after** he made comments about PLAINTIFF's last name, national origin, race, and religion.

81. Mr. Smith subsequently asked PLAINTIFF where PLAINTIFF was born, and then offensively stated, "You are not even a real American", "You are a Muslim."

82. Melissa Kanas (hereinafter "Ms. Kanas"), Trial Director, also engaged in harassing behavior based on PLAINTIFF's national origin. She would question whether PLAINTIFF was invited to and belonged in a meeting, and casted doubt on PLAINTIFF's performance as an attorney.

83. It is important to note that on or about February 6, 2023, PLAINTIFF was given an excellent performance evaluation. On a scale of 1-5, PLAINTIFF received a 4 on all categories that were evaluated.

84. On or about February 21, 2023, Ms. Kanas was in a meeting with PLAINTIFF and Ms. Lovly. While she displayed some "remorse" for her actions, Ms. Kanas proceeded to continue harassing PLAINTIFF thereafter.

85. Subsequent to the meeting, Ms. Kanas called a mock jury selection with no notice. During the selection, she said to PLAINTIFF: "I forget where you're from…but I know you're not from here right…this is New York, Suffolk County jury so I don't know if they'll like you."

86. On or about March 7, 2023, Mr. Smith made comments about getting rid of PLAINTIFF because of PLAINTIFF's national origin instead of PLAINTIFF receiving a salary. He stated, "Why would we pay *you* money when we can get rid of you and divide that money amongst ourselves?"

87. In an effort to further harass PLAINTIFF, Ms. Winecke assigned PLAINTIFF to Elsa Stossel, a secretary who has a reputation amongst PLAINTIFF's colleagues of being difficult to work with. Ms. Winecke commented that she was aware that this assignment was "torture."

88.  On or about April 20, 2023, Ms. Ahern saw that PLAINTIFF had worn an American Flag on his lapel. She said to PLAINTIFF: "Trying to look the part? Where are you from again - I forgot?"

89. This comment was made in front of Ms. Lovly, yet she remained silent and did not address the harassment that PLAINTIFF had faced.

90. The Judge was informed that PLAINTIFF had formally complained about her discriminatory actions towards PLAINTIFF. Thus, because PLAINTIFF was kept on

some cases before her, she yelled at PLAINTIFF during conferences for a trial that took place on April 20, 2023.

91. The Judge treated no other attorney the way she treated PLAINTIFF. Despite common knowledge that she was hostile towards PLAINTIFF, nothing was done to remedy the situation.

92. On or about June 6, 2023, PLAINTIFF's court partner, Avery Brogan, was replaced by Omar-Salih Yilmaz (hereinafter "Mr. Yilmaz").

93. Mr. Yilmaz identifies as a Muslim of Turkish descent/national origin.

94. Mr. Yilmaz made comments to PLAINTIFF about disliking the basis for the formation of Pakistan and stated how Pakistan became a nation because of the nationalistic approach of its people.

95. He also compared Pakistani Muslims to Indian Hindus and stated that "both groups are the same," which is offensive and untrue.

96. Mr. Yilmaz also expressed his desire that the Ottoman Empire regime prevail again. He informed PLAINTIFF that his great-grandfather served in the Ottoman Empire and participated in wars on behalf of the Ottomans. Mr Yilmaz also stated that the ruling period of the Ottoman Empire was the strongest Empire to ever exist, and that Turks are the supreme Muslims within the religion of Islam.

97. Mr. Yilmaz specifically stated to PLAINTIFF that Pakistani Muslims are inferior to Turks and Ottoman Muslims on account of their national origin.

98. PLAINTIFF found Mr. Yilmaz's comments to be both extremely inappropriate for the workplace and incredibly offensive.

99. On or about June 12, 2023, Ms. Winecke made a comment about white supremacy. She stated that her grandmother was German, and that Germans are the most powerful white American group in the U.S. post-WWII. Ms. Winecke also made remarks that cast the KKK and their actions in a favorable light.

100.    During a meeting on July 11, 2023 with both Ms. Winecke and Ms. Lovly present, PLAINTIFF stated that the hostile and discriminatory treatment by Ms. Winecke was unwelcome.

101.    Earlier on that same day, Ms. Winecke barged into PLAINTIFF's office, yelling at him about an earlier email discussion regarding the reassignment. On this same day, Ms. Lovly snatched files from PLAINTIFF while also yelling. A meeting was held, during which both apologized to PLAINTIFF for their inappropriate behavior.

102.    However, despite this apology, Ms. Lovly and Ms. Winecke continued to play favorites and perpetuate PLAINTIFF's discriminatory treatment. For example, aWhite staff attorney, Mr. Klopman, who began employment around the same time as PLAINTIFF was transferred to a more senior team before PLAINTIFF.

103.    Another example of a subordinate that received unfairly preferential treatment is Giulianna Farrell, who despite starting her employment after PLAINTIFF and having less experience than PLAINTIFF, was promoted before PLAINTIFF and is also White.  Ms. Farrell was trained by PLAINTIFF and upon information and belief, received a higher bonus than PLAINTIFF.

104.    Upon information and belief, attorneys belonging to a protected class were discriminated against. For example, Kara Brown (hereinafter "Ms. Brown"), despite being a tenured attorney with LAS for about eight (8) years, was forced to leave her

employment because she was only assigned cases to handle and given duties by Ms.
Lovly and Ms. Winecke, whereas other people in her position were assigned cases by a
variety of superiors and were able to excel.

105.    Ms. Brown identifies as a black female and expressed concerns that she was being
discriminated against based on her protected characteristics to PLAINTIFF.

106.    Ms. Brown even told PLAINTIFF to "guard and stand for" his rights, and to not let
anyone "discriminate" or "treat me wrong," before leaving her employment with LAS
and moving to Kentucky.

107.    On September 7, 2023, Mr. Lovly was informed again about the ongoing harassment
that PLAINTIFF was facing. PLAINTIFF also told her about Mr. Yilmaz, his comments,
and his fervent animosity towards Pakistani people.

108.    No remedial action was taken.

109.    On or about September 7, 2023, Ms. Lovly reassigned PLAINTIFF from client
"MS's" case, which PLAINTIFF had been working on for over a year, right before the
case was set to begin trial. Despite PLAINTIFF's request to find out the reason for the
case reassignment in writing, no written explanation was provided. Ms. Lovly's actions
were clearly motivated by favoritism towards another employee, Caitlin Ortiz, based on
her race and religion, rather than considering the merits of PLAINTIFF's work and
dedication to the case.

110.    PLAINTIFF was surprised that the employees of DEFENDANT engaged in such
hostile behavior towards him, especially when no other subordinate was treated or spoken
to this way.

111.    On October 30, 2023, Mr. Yilmaz had a substantial argument in the office about Muslims and Hindus with PLAINTIFF. He expressed his dislike of Pakistani Muslims by comparing them to Indian Hindus. Mr. Yilmaz expressed his offensive views about the history of the region of Pakistan, stating that "Indian Hindus have the same food, lifestyle and beliefs as  Pakistani Muslims – so they are the same people – you are all the same people." Also, Mr. Yilmaz disparaged the idea of having a separate country for Pakistani Muslims.

***Retaliation - Plaintiff's Unlawful Termination from his Employment with Defendant LAS***

112.    As detailed above, PLAINTIFF verbalized his complaints to his supervisors many times.

113.    Despite PLAINTIFF's verbal complaints, nothing was changed. Instead, as noted above, the antagonistic behavior directed towards PLAINTIFF by his coworkers continued unabated.

114.    PLAINTIFF continued to face harassment, discrimination and suffered an extremely toxic and hostile work environment.

115.    Finally, on July 14, 2023, PLAINTIFF put his complaints in writing to Human Resources (hereinafter "HR"), detailing the hostile work environment and unlawful discrimination he faced because of race, national origin, and religion, at work.

116.    That same day, a meeting took place between HR representative Pamela McLaughlin, Ms. Lovly, and Mr. Fleming  to discuss PLAINTIFF's reassignment on the "MS" case.

117.    During this meeting, the three discussed the case reassignment and the absolute need to fix the hostile work environment that existed because of The Judge's discriminatory

actions. Ms. Lovly claimed to be unaware of this contentious atmosphere, despite PLAINTIFF informing her on numerous occasions. In fact, PLAINTIFF had complained about The Judge to Ms. Lovely during the first week of his assignment to Courtroom D61.

118.    PLAINTIFF was not surprised that Ms. Lovly took this position because she chose to maintain PLAINTIFF's assignment for **six** (6) months following his complaint, despite having the authority to change courtroom assignments.

119.    This lack of action had a direct impact on PLAINTIFF's respect and dignity, and empowered other employees to engage in targeted harassment and discrimination against PLAINTIFF.

120.    After his initial complaint, PLAINTIFF was retaliated against after engaging in protected activity.

121.    Ms. Lovly began to micromanage PLAINTIFF and conduct regular, singular, and in-person case reviews with him.

122.    No such reviews took place prior to PLAINTIFF's complaints, and upon information and belief, was not common practice among other employees.

123.    Ms. Lovly reassigned a case of PLAINTIFF's right before trial, without providing a reason for doing so.

124.    Instead, Ms. Lovly had another co-worker cover a case for PLAINTIFF, despite promising she would handle it herself.

125.    This sporadic case management affected PLAINTIFF's ability to effectively carry out his professional responsibilities.

126.    On November 13, 2023, PLAINTIFF was investigated for allegedly "working from home", a regular and common practice among the LAS staff. However, PLAINTIFF was singled out.

127.    On November 13, 2023, PLAINTIFF filed his second complaint of discrimination.

128.    The next day, on November 14, 2023, PLAINTIFF was terminated.

129.    The purported reason for PLAINTIFF's termination was because PLAINTIFF was not present in Court when his case was called, and because PLAINTIFF had other attorneys cover PLAINTIFF's cases when he could not make it in.

130.    LAS maintained that these actions somehow "violated" its work from home policy.

131.    The work from home policy dictates that attorneys are required to be present when they have cases scheduled. As long as arrangements are made, attorneys can cover other attorney's cases. There is a minimum of two (2) days that attorneys need to physically be present in the office.

132.    PLAINTIFF received a copy of PLAINTIFF's personnel file, and it should be noted that, ironically, but not surprisingly, all the notes to PLAINTIFF's file started **after** PLAINTIFF made complaints to PLAINTIFF's supervisors and HR about discrimination.

133.    It also contains notes about an alleged "investigation" into PLAINTIFF's complaint; however, PLAINTIFF was never interviewed. Regardless, those who were "questioned" by HR were not even present to witness the discrimination and harassment perpetrated against PLAINTIFF.

134.    Attorneys at LAS **regularly** covered each other's conferences and those outside of PLAINTIFF's protected class were **not** disciplined or terminated for this practice.

135.   Examples of LAS's disparate treatment towards PLAINTIFF include, but are not

limited to,  the below list of employees who regularly covered for each other or asked for

PLAINTIFF to cover them – none of whom were similarly terminated:

- On or about January 18, 2022, Mr. Smith was working from home when he had cases in the Courtroom. Another colleague covered the appearance, and Mr. Smith faced no reprimand.
- On or about February 15, 2022, Laura Stein (hereinafter "Ms. Stein"), a co-worker and Staff Attorney, asked PLAINTIFF to cover a case for her. Ms. Stein faced no reprimand for having another attorney cover her case.
- On or about February 16, 2022, Mr. Smith asked PLAINTIFF to cover a case for him. Mr. Smith faced no reprimand for having another attorney cover his case.
- On or about March 1, 2022, Ms. Stein asked PLAINTIFF to cover two cases for her. Ms. Stein faced no reprimand for having another attorney cover her cases.
- On or about March 18, 2022, Ms. Stein asked  PLAINTIFF to cover two cases for her again. Ms. Stein faced no reprimand for having another attorney cover her cases.
- On or about April 4, 2022, Ms. Stein faced no reprimand for having another attorney cover her case.
- On or about May 10, 2022, Devin Loguercio, Staff Attorney, asked PLAINTIFF to cover a case for him. Mr. Loguercio faced no reprimand for having another attorney cover his case.
- On or about June 24, 2022, Mr. Levinson asked PLAINTIFF to cover a case for him; a case that actually belonged to another attorney. Mr. Levinson faced no reprimand for having another attorney cover his case.
- On or about December 20, 2022, Mr. Levinson asked PLAINTIFF to cover a case for him. Mr. Levinson faced no reprimand for having another attorney cover his case.
- On or about December 22, 2022, Mr. Levinson asked PLAINTIFF to cover a case for him. Mr. Levinson faced no reprimand for having another attorney cover his case.
- On or about December 27, 2022, Mr. Levinson asked PLAINTIFF to cover a case for him. Mr. Levinson faced no reprimand for having another attorney cover his case.
- On or about January 5, 2023, Weronika Bzura (hereinafter "Ms. Bzura"), Staff Attorney, asked PLAINTIFF to cover a case for her. Ms. Bzura faced no reprimand for having another attorney cover her case.
- On or about January 10, 2023, Ms. Bzura asked PLAINTIFF to cover  a case for her. Ms. Bzura faced no  reprimand for having another attorney cover her case.
- On or about January 23 2023, Ms. Bzura asked PLAINTIFF to cover a case

for her. Ms. Bzura faced no  reprimand for having another attorney cover her case.

- On or about February 1, 2023, Ms. Brown asked PLAINTIFF to cover a case for her. Ms. Brown faced no reprimand for having another attorney cover her case.

-  On or about February 2, 2023, Ms. Bzura asked PLAINTIFF to cover  a case for her. Ms. Bzura faced no reprimand for having another attorney cover her case.

- On or about February 16, 2023, Ms. Brown asked PLAINTIFF to cover a case for her. Ms. Brown faced no reprimand for having another attorney cover her case.

- On or about March 3, 2023, Ms. Bzura asked PLAINTIFF to cover a case for her. Ms. Bzura faced no reprimand for having another attorney cover her case.

- On or about March 6, 2023, Ms. Brown asked PLAINTIFF to cover a case for her. Ms. Brown faced no reprimand for  having another attorney cover her case.

- On or about March 7, 2023, Ms. Bzura asked PLAINTIFF to cover a case for her. Ms. Bzura faced no reprimand for having another attorney cover her case.

- On or about March 23, 2023, Bradley Kaufman (hereinafter "Mr. Kaufman"), Staff Attorney, asked PLAINTIFF to cover  a case for him.. Mr. Kaufman faced no reprimand for having another attorney cover his case.

- On or about March 28, 2023, Ms. Bzura asked PLAINTIFF to cover  a case for her. Ms. Bzura faced no reprimand for having another attorney cover her case.

- On or about April 11, 2023, Avery Brogan, Staff Attorney, asked PLAINTIFF to cover a  case for him. Mr. Brogan faced no reprimand for having another attorney cover his case.

136.    Ms. Lovly began to micromanage PLAINTIFF and conduct regular, singular, and in-person case  reviews.

137.    These non-Muslim, non-Pakistani employees were not disciplined or terminated for engaging in the exact pattern of behavior allegedly PLAINTIFF was terminated for.

138.    These were common practices which all supervisors were aware of, allowed, participated  in, and yet, **only** PLAINTIFF was disciplined for it.

139.    The November 6, 2023, and November 9, 2023, notes on PLAINTIFF's personnel file indicate that PLAINTIFF's employer had "warned" PLAINTIFF on July 14, 2023, about

the remote work policy. However, contrary to this assertion, no warning about remote work was provided during this meeting.

140.    Instead, the Bureau Chief actually *confirmed* that it was permissible to work from home when client cases are scheduled. The primary subject of this meeting was to discuss case reassignment, rather than to warn PLAINTIFF about any potential disciplinary actions related to the remote work policy.

141.    On November 1, 2023, on or about 1:00 PM, PLAINTIFF met with Ms. Lovly and Andrew Scardino (Managing Attorney), in Ms. Lovly's office.

142.    Before the meeting, Ms. Lovly had provided a list of cases of the following week of November 6, 2023 through November 10, 2023. PLAINTIFF had also prepared a list of cases for that week.

143.    During the meeting, PLAINTIFF discussed all of the cases that were scheduled for the aforementioned week. One of the cases in the list was a case of "MS" PLAINTIFF explained to Ms. Lovly the extensive case history and status, and specifically informed Ms. Lovly that this case is on for motions, explaining that PLAINTIFF was the third attorney from LAS to file motions on the case. Ms. Lovly acknowledged this.

144.    PLAINTIFF then informed Ms. Lovly that PLAINTIFF would verify whether he had all of the court minutes for the dates requested to attach to the motion, and that PLAINTIFF would submit a draft for Ms. Lovly's review on Monday, November 6, 2023.

145.    PLAINTIFF then stated that he had two traffic cases on November 6, 2023, and asked for permission for his court partner, Mr. Yilmaz, to cover these two cases ("LM" and

"TH" Cases) so that PLAINTIFF could work on the motion from home for "MS". Ms. Lovly responded, "as long as Omar or someone else covers the cases for you, it is okay."

146.    On November 6, 2023, PLAINTIFF called and asked Mr. Yilmaz if he could cover the cases for him. Mr. Yilmaz, without any hesitation, agreed to cover the cases. Upon completion, Mr. Yilmaz texted me that all charges were dismissed against "LM" and "TH" next court date was scheduled for December 12, 2023, for a Warrant Review, as the Defendant failed to appear.

147.    While Mr. Yilmaz handled the traffic cases, PLAINTIFF worked on the motion from home, and sent the motion to Ms. Lovly for review on or about 3:08 PM on November 6, 2023.

148.    Contrary to the employer's assertion, there was no violation of the remote work policy on November 6, 2023. During the meeting on November 1, 2023, the Bureau Chief confirmed that it is permissible to work from home when client cases are scheduled.

149.    Therefore, the purported violation from work from home policy on November 6, 2023, is unfounded. The Bureau Chief was informed about and approved of PLAINTIFF's intention to work from home on November 1, 2023.

150.    PLAINTIFF's employer's attempt to terminate PLAINTIFF was a response to complaints filed about ongoing discrimination on July 14, 2023, and November 13, 2023 (and including all the verbal complaints he had made).

151.    The incident on November 6, 2023, is a false and unlawful reason for the discharge and is merely a pretext to cover the true reason, which is unlawful discrimination.

152.    There was a meeting held on November 13, 2023, with PLAINTIFF, Pamela McLaughlin, Joseph King, Ms. Lovly, and Charles Fox. The purpose of the meeting was to investigate violations of the work from home policy.

153.    It is abundantly clear that the reasons provided for PLAINTIFF's termination are simply pretextual, and the personnel file is filled with fabricated instances to make it appear as if there is a non-discriminatory and non-retaliatory reason for PLAINTIFF's termination. However, as detailed herein, this termination was purposeful and malicious.

154.    As attorneys and officers of the Court, LAS knew and/or should have reasonably known that their comments and actions were not just inappropriate, but illegal.

*Union Grievance*

155.    PLAINTIFF was represented by a union and filed a grievance.

156.    When PLAINTIFF filed his first grievance, he was informed that his discrimination and retaliation complaints would not be included. Specifically, Lani Houston, Staff Attorney, and Union President, informed PLAINTIFF that human rights and employment law violations in general go through either the EEOC or personal counsel.

157.    After both Steps 1 and 2 were initiated, the union again noted that they do not enforce federal or state anti-discrimination laws, and that they could not pursue those claims for PLAINTIFF. They specifically stated that these claims do not relate to PLAINTIFF's collective bargaining agreement and arbitration process.

158.    Thus, PLAINTIFF had no choice but to file with the EEOC.

**FIRST CAUSE OF ACTION**

**Title VII of The Civil Rights Act of 1964 - 42 U.S.C. § 2000e: Racial, Religious, and,**

**National Origin Discrimination Creating a Hostile Work Environment**

159.    PLAINTIFF repeats and realleges each and every allegation of the preceding

paragraphs hereof with the same force and effect as though fully set forth herein.

160.    DEFENDANTS have violated Title VII by subjecting PLAINTIFF to discrimination

resulting in the creation of a hostile work environment on the basis of race, religion, and

national origin.

161.    As a direct result of DEFENDANT's unlawful discriminatory employment practices,

PLAINTIFF experienced both economic and emotional loss.

162.    PLAINTIFF has suffered loss of income, loss of future earnings, depression, anxiety,

stress, loss of appetite, loss of sleep as a result of the discrimination and retaliation.

163.    PLAINTIFF has had to seek professional help and had to seek medical treatment

during employment and after to cope with mental distress.


**SECOND CAUSE OF ACTION**

**Violations of New York State Human Rights Law, New York State Executive Law, §§**

**296 *et seq*)**

164.    PLAINTIFF repeats and realleges each and every allegation of the preceding

paragraphs hereof with the same force and effect as though fully set forth herein.

165.    DEFENDANTS engaged in unlawful discriminatory practices against PLAINTIFF

including, without limitation, racial, religious, and national origin discrimination leading

to the creation of a hostile work environment.

166.   DEFENDANT's discriminatory against PLAINTIFF affected the status, terms, conditions, and privileges of his employment.

167.   As a result of DEFENDANT's actions, PLAINTIFF experienced both economic and emotional loss. PLAINTIFF has suffered from depression, anxiety, stress, loss of appetite, loss of sleep as a  result of the discrimination.

168.    PLAINTIFF has had to seek professional help and had to seek medical treatment during employment and after to cope with mental distress.


**THIRD CAUSE OF ACTION**

**Title VII of The Civil Rights Act of 1964 - 42 U.S.C. § 2000e: Retaliation**

169.   PLAINTIFF repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

170.   DEFENDANT violated the Title VII of the Civil Rights Act of 1964 by retaliating against PLAINTIFF for filing complaints alleging unlawful discrimination based upon his race, religion, and national origin.

171.   PLAINTIFF engaged in protected activity by filing multiple complaints with the DEFENDANT.

172.   PLAINTIFF suffered an adverse employment action when he was terminated from his position with LAS.

173.   The reasons provided for termination are pretext for retaliation.

174.   The adverse employment action was materially adverse because PLAINTIFF's cessation of employment constituted a change in his compensation, terms, conditions, and privileges of employment.

175.    If PLAINTIFF had not filed a complaint alleging discriminatory conduct by his colleagues and supervisors, he would not have been terminated.

### FOURTH CAUSE OF ACTION

### Violations of New York State Human Rights Law, New York State Executive Law, §§ 296 *et seq*): Retaliation

176.    PLAINTIFF repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

177.    DEFENDANT violated the New York State Human Rights Law, New York State Executive Law, §§ 296 *et seq*) by retaliating against PLAINTIFF for filing complaints alleging unlawful discrimination based upon his race, religion, and national origin.

178.    PLAINTIFF engaged in protected activity by filing multiple complaints with the DEFENDANT.

179.    PLAINTIFF suffered an adverse employment action when he was terminated from his position with LAS.

180.    The reasons provided for termination are pretext for retaliation.

181.    The adverse employment action was materially adverse because PLAINTIFF's cessation of employment constituted a change in his compensation, terms, conditions, and privileges of employment.

182.    If PLAINTIFF had not filed a complaint alleging discriminatory conduct by his colleagues and supervisors, he would not have been terminated.

### PRAYER FOR RELIEF

**WHEREFORE**, upon all of the facts, allegations, and causes of action as set forth and alleged herein, PLAINTIFF respectfully requests that this Court provide:

A. An order for declaratory judgment that the actions, conduct, and practices of DEFENDANT complained of herein violate the laws of the United States;

B. An order for injunction and order permanently restraining DEFENDANT from engaging in such unlawful conduct;

C. An order directing DEFENDANT to place PLAINTIFF in the position PLAINTIFF would have occupied but for DEFENDANT's discriminatory, retaliatory and/or otherwise unlawful treatment of PLAINTIFF conduct in violation of the Title VII and NYS law as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices and other unlawful conduct are eliminated and do not continue to affect PLAINTIFF;

D. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate PLAINTIFF for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, commissions, compensation, job security, unpaid sick and personal time off days, and other benefits of employment;

E. An award of compensatory and punitive damages;

F. An award of damages for any and all other monetary and/or non-monetary losses suffered by PLAINTIFF in an amount to be determined at trial, plus prejudgment interest;

G. An award of costs that PLAINTIFF has incurred in this action, as well as PLAINTIFF's reasonable attorney's fees to the fullest extent permitted by law; and

H. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all issues so triable.


Dated: Commack, New York
        November 4 , 2024

                                        Respectfully Submitted,


                                        **Pervez & Rehman, P.C.**
                                        *Attorneys for Plaintiff*

                                        *Aneeba Rehman*
                                        _____
                                        Nadia M. Pervez, Esq.
                                        Aneeba Rehman, Esq.
                                        6268 Jericho Turnpike, Suite 8,
                                        Commack, NY 11725

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
SEAN IMRAN,

                        Plaintiff,                           Case No.:

            -against-                                        **VERIFIED COMPLAINT**

LEGAL AID SOCIETY OF SUFFOLK COUNTY, INC.                    Jury Trial Demanded

                        Defendant.
------------------------------------------------------------------X

**VERIFICATION**

STATE OF  Illinois    )
                                    ss.:
COUNTY OF  Lake       )


I, SEAN IMRAN, am the Plaintiff in the within action for. I have read the foregoing Verified Complaint and know the contents thereof. The contents are true to my own knowledge except as to matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

_____
SEAN IMRAN

Sworn to before me on this 1st day
of November, 2024.

_____
Notary Public

OFFICIAL SEAL
ESTEFANIA SUAREZ
NOTARY PUBLIC - STATE OF ILLINOIS
COMMISSION #977029
MY COMMISSION EXPIRES 8/22/2027